SKOGLUND, J.
¶ 1. The fundamental issue in this case is whether petitioner should be found eligible for developmental disability services. The Department of Disabilities, Aging and Independent Living (DAIL) denied petitioner's request for services, finding him ineligible. The Human Services Board reversed DAIL's decision. The Secretary of the Agency of Human Services reversed the Board's decision and reinstated DAIL's decision. This appeal followed.
¶ 2. Before us is the question of whether a standard error of measurement is properly applied to IQ scores used to qualify persons for developmental disability services. We conclude that the plain language of the applicable regulations incorporates the standard error of measurement of plus or minus five points for an IQ test and, therefore, petitioner's IQ score of 75 combined with the other evidence in the case qualified him for services. Therefore, we reverse the Secretary's decision denying services to petitioner and remand for reinstatement of the Board's decision.
*1248 I. Applicable Statutes and Regulations
¶ 3. Before examining the facts of petitioner's appeal, it is helpful to set forth the underlying statutory and regulatory scheme. The Developmental Disabilities Act provides services "for people with developmental disabilities and their families within Vermont." 18 V.S.A. § 8723. The program operates under a federal Medicaid waiver and the statute directs DAIL, part of the Agency of Human Services, to "maintain a statewide system of quality assessment and assurance for services provided to people with developmental disabilities and provide quality improvement support." Id. § 8723(7). Eligibility for services depends on both income and clinical factors. The clinical factors are at issue in this appeal.
¶ 4. The statute defines developmental disability as
a severe, chronic disability of a person that is manifested before the person reaches 18 years of age and results in:
(A) intellectual disability, autism, or pervasive developmental disorder ; and
(B) deficits in adaptive behavior at least two standard deviations below the mean for a normative comparison group.
Id. § 8722(2). Petitioner sought services because he claimed he had an "intellectual disability."
¶ 5. DAIL has adopted regulations to establish criteria for who is eligible for services. Health Care Administrative Rules (HCAR), Regulations Implementing the Developmental Disabilities Act of 1996, Code of Vt. Rules 13 174 007, [hereinafter DD Regs], http://humanservices.vermont.gov/on-line-rules/health-care-administrative-rules-hcar/final-clean. ddact-regulations-10-01-2017.pdf [https://perma.cc/T88R-BZ5Y].[1] DAIL regulations define "intellectual disability" as
significantly sub-average cognitive functioning that is at least two standard deviations below the mean for a similar age normative comparison group. On most tests, this is documented by a full scale score of 70 or below on an appropriate norm-referenced standardized test of intelligence and resulting in significant deficits in adaptive behavior manifested before age 18.
Id. § 2.4(a). To determine whether a child or adult has an intellectual disability, DAIL regulations direct that a psychologist is to perform assessments of the individual's cognitive functioning and deficits in adaptive behavior and "[i]ntegrate these test results with other information about the individual's abilities." Id. § 2.6(a). The DD Regs indicate which standardized intelligence test should be used for school-age children and adults and provide: "Diagnosis based on interpretation of test results takes into account a standard error of measurement for the test used." Id. § 2.6(b).[2]
¶ 6. Some explanations regarding terminology are important.[3] The regulations use the terms "standard deviations" and "standard *1249 error of measurement." The standard deviation "describes how scores are dispersed in a population." Hall v. Florida, 572 U.S. 701, 711, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). The mean IQ test score is 100 and the standard deviation for an IQ test is fifteen points; therefore, a score two standard deviations from the mean is thirty points from the mean or a score of 70. Id. The standard error of measurement (SEM) concerns the reliability of a particular test result and reflects that an IQ test score "should be read not as a single fixed number but as a range." Id. at 712, 134 S.Ct. 1986. The SEM associated with a test is a reflection that an individual's IQ score can fluctuate on any given exam due to a variety of factors. Id. at 713, 134 S.Ct. 1986. The SEM for an IQ test is plus or minus five points. If the SEM is taken into account, then scores at or below 75 would qualify under the regulations as "a full scale score of 70 or below on an appropriate norm-referenced standardized test of intelligence." DD Regs § 2.4(a). Here, there was little dispute that R.R. had "significant deficits in adaptive behavior manifested before age 18," id.; the issue was whether R.R. had an IQ score that could potentially qualify him for benefits.
II. Facts
¶ 7. Petitioner applied for Home and Community-Based Services (HCBS) for individuals with qualifying developmental disabilities through the Howard Center, his designated mental-health agency. At the time, petitioner was living with his parents, who adopted him as an infant. R.R. has fetal alcohol spectrum disorder (FASD) and has been diagnosed with fetal alcohol effects (FAE). R.R. was first diagnosed when he was six and has also been diagnosed with attention-deficit-hyperactivity disorder (ADHD), Oppositional Defiant Disorder, Borderline Intellectual Functioning, Borderline Personality Disorder, Post-Traumatic Stress Disorder, and mood disorders. R.R. has functional delays and behavioral challenges. In 2007, when he was twelve years old, petitioner had an IQ test and received an IQ score of 75. The evaluation recommended petitioner for eligibility for developmental disability services.
¶ 8. R.R. was evaluated in July 2015 in connection with his application for services. The July 2015 evaluation resulted in a full-scale score of 77. The Howard Center determined that R.R. was not eligible for services because he did not have a qualifying developmental disability under the Department's regulations. A notice sent to petitioner cited the 2015 score of 77 and explained that to be eligible an applicant needed to have an IQ score of 70 or lower. R.R.'s parents[4] appealed the decision to the DAIL Deputy Commissioner, who affirmed the denial.
¶ 9. R.R.'s parents appealed that denial to the Human Services Board. See 3 V.S.A. § 3091(a) (providing right to file request for fair hearing to Human Services Board following denial of assistance by DAIL). The Board assigned a hearing officer to make factual findings and a recommendation to the Board. Id. § 3091(b) - (c).
¶ 10. The hearing officer held an initial merits hearing on November 16, 2016. An educator at R.R.'s school, R.R.'s pediatrician, and a licensed psychologist all testified at the hearing in support of R.R.'s eligibility for developmental services. All parties agreed that the 2015 IQ test of R.R. was accurate but disputed whether *1250 the IQ test was an appropriate or reliable mechanism for diagnosing an intellectual disability in R.R.'s case. In essence, R.R.'s providers explained that due to R.R.'s FASD he was unable to access the level of intelligence reflected in the IQ testing outside of the controlled testing environment. Based on this evidence, R.R. argued that even though his score was above the cutoff of 70, he should qualify given that the test was not an accurate reflection of his need for services. The hearing officer concluded that the definition of intellectual disability in the DAIL regulations required a score of 70 or below and that R.R. did not qualify. The hearing officer concluded that the regulations did not support R.R.'s suggestion to consider whether he was eligible even if his score was above the cutoff because the test did not reflect his ability to use that level of intelligence outside of the testing environment. The hearing officer recommended affirming the denial of services.
¶ 11. The Board remanded the matter to the hearing officer for further consideration. The hearing officer requested briefing from the parties on the relevance of R.R.'s 2007 IQ score of 75 and whether it could be used to establish his eligibility. The hearing officer also requested that DAIL address the basis for its apparent refusal to apply the DSM-5 standards, which considered scores above 70 because (1) with application of the SEM, scores up to 75 equated to a score of 70; and (2) clinical judgment was necessary to determine if a person with a score above 70 still had adaptive behavior problems.
¶ 12. In September 2017, the hearing officer made a further recommendation to the Board with supplemental factual findings. The hearing officer questioned whether petitioner's score of 75 could make him eligible for services given that DAIL interpreted its regulations as consistent with the DSM-5 and that DAIL's own expert testified that she would consider an IQ score of 75 as potentially meeting the threshold for intellectual disability. The hearing officer further noted that DAIL's own regulations provided that clinical judgment be exercised in reviewing the applicability of IQ scores above and below 70, but that here DAIL did not decide whether the 2015 score "most accurately reflected [petitioner's] cognitive ability." DD Regs § 2.6(e). The hearing officer concluded that DAIL had improperly given the 2015 score of 77 preclusive effect. Therefore, the hearing officer recommended that the matter be remanded to DAIL for consideration of petitioner's eligibility based on the 2007 IQ score of 75. In October 2017, the Board considered the recommendation and again remanded the matter to the hearing officer for further consideration.
¶ 13. At the subsequent hearing before the hearing officer, DAIL represented that it interpreted the regulations to require a score of 70 or below to qualify and that the SEM did not apply. The hearing officer pointed out that this position differed from DAIL's prior position, which was that it did not take a rigid approach and that DAIL considered scores up to 75 because of the SEM. The hearing officer also noted that DAIL's own expert had previously testified that petitioner would have qualified if his second IQ test of 77 had been two points lower. Petitioner argued that DAIL's interpretation of the regulations was not supported by its own expert, not consistent with its past practice, and not supported by the DSM-5.
¶ 14. The hearing officer made a third and final recommendation to the Board, concluding that the elements for diagnosis of an intellectual disability had been met. The Board accepted and adopted the recommendation and associated findings. The *1251 Board concluded that the regulations incorporated the SEM for interpreting IQ scores. The Board relied in part on the definition of intellectual disability in the DSM-5, which includes consideration of IQ scores above 70, but within the SEM.[5]
¶ 15. The Board found that DAIL's position requiring at least one test with a score of 70 or below was inconsistent with its regulations, DAIL's own acceptance of the DSM-5, and DAIL's expert's opinion. Although DAIL maintained that its application of the regulations was consistent with the DSM-5, that it did not have a rigid cap, and that it considered scores within the SEM, that is 65-75, it still interpreted the regulations as requiring at least one score of 70 or below, without application of the SEM. The Board interpreted the definition of "intellectual disability" in the regulations of "two standard deviations below the norm" as an IQ score of 65-75. The Board concluded that DAIL had provided no medical, clinical, or other substantive basis for its use of a strict cutoff of 70. Further, the Board found that DAIL had not provided a substantive reason for why the score of 75 could not be the basis for petitioner's eligibility, other than failure to comply with the strict cutoff. The Board noted that prevailing medical standards and court decisions have rejected using a strict cutoff of 70, as set forth in the DSM-5 and in Hall, 572 U.S. at 722, 134 S.Ct. 1986 (explaining that Florida went against unanimous professional consensus in implementing "strict cutoff at 70"). The Board concluded that DAIL's interpretation of the regulation to require a strict cutoff of 70 was not only inconsistent with the regulatory language, but arbitrary and without a rational basis and therefore the Board did not exclude the prior score of 75. The Board found that the evidence demonstrated that petitioner's prior score was the most reliable and accurate measure of petitioner's intellectual functioning. Therefore, the Board reversed DAIL's denial of eligibility.
¶ 16. The Secretary of Human Services then reversed the Board's order as unsupported by the record and contrary to its regulations. See 3 V.S.A. § 3091(h)(1)(A) (allowing Secretary to reverse Board decision if Board's findings lack support or "the decision or order misinterprets or misapplies State or federal policy or rule"). The Secretary concluded that the record and the regulations did not support the Board's decision to rely on the 2007 test score because under the regulations DAIL was required to use a current assessment of petitioner's functioning, which the Secretary interpreted to mean the 2015 score of 77. The Secretary also concluded that the Board's interpretation of a qualifying full-scale IQ score contradicted the plain meaning of the regulations. The Secretary interpreted the language of the regulations-stating that a person must "have a full-scale IQ score of 70 or below"-as setting a fixed bar that does not incorporate the SEM. The Secretary concluded that, even accepting application of the SEM, petitioner did not qualify because his current score of 77 exceeded the cutoff.
*1252 The Secretary reversed the Board and reinstated DAIL's denial of benefits. Petitioner appeals.
III. Standard of Review
¶ 17. When an agency decision is appealed to the Board, the Board may "affirm, modify, or reverse." Id. § 3091(d). The hearing officer acts as the factfinder for the Board and the Board must approve those findings "unless good cause is shown for disapproving them." Id. § 3091(c). After the Board makes a decision, the Secretary can review it in certain cases and can reverse or modify the Board's order if the Board's findings lack support in the record or "the decision or order misinterprets or misapplies State or federal policy or rule." Id. § 3091(h)(1)(A)(i), (ii). This Court gives deference to the Secretary "regarding interpretations of the department's governing statutes and regulations, and will not disturb the Secretary's interpretations absent a compelling indication of error." Jacobus v. Dep't of PATH, 2004 VT 70, ¶ 23, 177 Vt. 496, 857 A.2d 785 (mem.).
IV. Petitioner's Arguments
¶ 18. Petitioner contends that the Secretary erred in (1) concluding that the evidence did not support the Board's decision to rely on the 2007 test score, and (2) interpreting the applicable regulations as not applying the SEM to an IQ score used to qualify persons for services.
A. Application of Petitioner's 2007 IQ Score of 75
¶ 19. We first address the relevance of petitioner's multiple test scores to his eligibility. Petitioner had two IQ scores: a 2007 score of 75 and a 2015 score of 77. The Board found that the 2007 score was most indicative of petitioner's level of functioning and used that score to determine petitioner's eligibility. The Secretary reversed the Board, concluding that the Board's finding was not supported and was incorrect as a matter of law because it did not comply with DAIL regulations requiring use of a current assessment of petitioner's cognitive functioning.
¶ 20. Petitioner argues that the Secretary exceeded his authority in reversing the Board's factual findings related to use of the 2007 score. The Secretary rejected the Board's finding that the 2007 score was the most reasonable and appropriate basis to determine petitioner's eligibility, concluding that there was "no clinical basis in the record" for the finding.[6] The Secretary is limited in reviewing the Board's factual findings and may "reverse or modify factual findings in a board decision only if 'the board's findings of fact lack any support in the record.' " Jacobus, 2004 VT 70, ¶ 7, 177 Vt. 496, 857 A.2d 785 (quoting 3 V.S.A. § 3091(h)(1)(A) ). Moreover, the Board has "discretion to evaluate the credibility of the witnesses and determine the weight that should be given to *1253 the evidence." In re Ryan, 2008 VT 93, ¶ 13, 184 Vt. 597, 958 A.2d 678 (mem.).
¶ 21. Here, the record amply supported the Board's finding. There was no factual dispute below as to the validity of the 2007 score.[7] The Board credited the opinions of petitioner's educators, psychologist, and pediatrician that petitioner's cognitive functioning, including "his ability to process and retain information, acquire and retain even rote skills, and executive functioning" were highly comparable to someone with an intellectual disability. The Board found that petitioner's psychologist credibly diagnosed petitioner with an intellectual disability based on his clinical presentation. The Board also was persuaded that petitioner's score of 77 was "higher than would be reasonably expected, based on his patent deficits." The Board noted that DAIL had not presented any substantive reason that the 2007 score was not an accurate reflection of petitioner's functioning. Therefore, the Board found that petitioner's 2007 score was "accurate, reasonable, the most appropriate reflection of his cognitive functioning, and most consistent with petitioner's numerous intellectual and adaptive challenges (as well as being specific to his intellectual development prior to age 18)." Because the Board's assessment that petitioner's 2007 score was the most accurate reflection of his level of functioning is supported by the record, the Secretary lacked authority to reverse or modify it. 3 V.S.A. § 3091(h)(1)(A).
¶ 22. The Secretary also rejected use of the 2007 score on the basis that the 2007 score was not a current assessment of petitioner's cognitive functioning, as defined in the regulations. The Secretary's conclusion hinges on DD Regs § 2.6, titled "Process for determining whether a school-aged child or adult has an intellectual disability," which states that determining whether a person has an intellectual disability
shall be based upon current assessment of cognitive functioning and a review of any previous assessments of cognitive functioning. It is the responsibility of the psychologist to decide whether new cognitive testing is needed. In general, for school-aged children, 'current' means testing conducted within the past three years. For adults, 'current' means cognitive testing conducted in late adolescence or adulthood.
DD Regs § 2.6(c) (emphasis added). The Secretary concluded that petitioner's 2007 score, taken when he was school-aged, was no longer current, and that § 2.6(c) required use of the more-recent 2015 test result.
¶ 23. The Secretary's interpretation is inconsistent with the plain language of the regulation. The regulation does not contain a presumption that determining if a person has an intellectual disability must be based on the most-recent score without regard to prior scores. To the contrary, the plain language of the regulation requires that determining whether an individual has an intellectual disability should be based on both a "current assessment of cognitive functioning and a review of any previous assessments of cognitive functioning." Id. (emphases added).[8] Here, the Board's analysis *1254 was consistent with the regulations in that the assessment considered both the 2015 and 2007 scores. Moreover, the regulation does not automatically disqualify a childhood score that is more than three years old. Finally, the decision as to whether additional testing is necessary is left to the discretion of the psychologist. Here, the Board credited petitioner's psychologist's testimony that the 2007 score was an accurate representation of petitioner's level of cognitive functioning. Therefore, there was no contravention of the regulation.
B. Standard Error of Measurement
¶ 24. Petitioner next argues that the Secretary erred in concluding that the statutes and implementing regulations do not incorporate the SEM when it comes to determining if a person meets the IQ threshold of 70. Petitioner asserts that the SEM is explicitly incorporated in the regulations and that construing the regulations to not incorporate the SEM would lead to irrational results.
¶ 25. The regulations specifically address the SEM. Section 2.6, which lays out the process for determining whether a child or adult has an intellectual disability, states:
The most universally used standardized intelligence test for school-aged children up to age 16 is the Wechsler Intelligence Scale for Children (WISC), current edition. The most universally used measure for children over age 16 and adults is the Wechsler Adult Intelligence Scale (WAIS), current edition. For people with language, motor, or hearing disabilities, a combination of assessment methods shall be used and the psychologist shall use clinical judgment to determine the best tests to use for the individual. Diagnosis based on interpretation of test results takes into account a standard error of measurement for the test used.
DD Regs § 2.6(b) (emphasis added). As set forth above, there are four sentences in this paragraph. The first two provide the test to be used for school-age children and adults, respectively; the third addresses individuals with language, motor, or hearing disabilities; and the final sentence directs that the SEM be used in interpreting test results.
¶ 26. DAIL argues that the final sentence of the paragraph applies to only the immediately preceding, third sentence of the paragraph, and not the first two. DAIL asserts that this is a grant of flexibility to a reviewing psychologist to accommodate individuals with disabilities in testing and is not intended to be used in interpreting scores for tests done under the first two sentences.
¶ 27. We construe regulations, like statutes, beginning with the plain language of the regulation. In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621, 949 A.2d 1073 (mem.). "Despite the great weight usually accorded to an agency's interpretation of its own regulations, this Court will disregard that interpretation where it is plainly erroneous or inconsistent with the regulation." Slocum, 154 Vt. at 482, 580 A.2d at 956.
¶ 28. We conclude that DAIL's interpretation of the regulation is inconsistent with the plain language and therefore do not *1255 defer to it. The final sentence of § 2.6 states that interpreting test results should take into account the SEM. There is nothing in the final sentence to indicate that it was intended to apply to only the preceding sentence. Moreover, DAIL has not provided any rational explanation for limiting the application of the SEM to only the scores of those with language, motor, or hearing disabilities. Although the regulations provide a person's psychologist with flexibility in determining which test to employ for persons with language, motor, or hearing disabilities, the record reflects no rational reason why the scores of those tests should incorporate a SEM while the scores for those without such disabilities should not.
¶ 29. On appeal, DAIL offers evidence of the history behind the adoption of its regulations to demonstrate that DAIL did not intend to adopt the SEM to IQ scores used to determine eligibility. Because we conclude that the plain language of the rule requires application of the SEM, we do not consider this rule-making history in interpreting the regulation. We also are not persuaded by DAIL's reliance on federal case law interpreting social security law because the regulatory language in those cases did not explicitly adopt the SEM.
¶ 30. Because we conclude that the plain language of the regulations requires applying the SEM to petitioner's score, we also reject the Secretary's reasoning that petitioner is excluded under the regulation that disqualifies individuals whose IQ scores are consistently above 70. See DD Regs § 2.6(d). As explained above, petitioner's IQ score of 75, when the SEM is applied, is a score of 70-80, and met the threshold of 70. Therefore, he did not have multiple IQ scores consistently above the threshold of 70.
¶ 31. In sum, we conclude that the Secretary lacked authority to reverse the Board's factual findings and erred in interpreting the regulations. Therefore, we reverse the Secretary's decision and remand for reinstatement of the Board's decision.
Reversed and remanded.

Effective October 1, 2017, DAIL revised its regulations implementing the Developmental Disabilities Act. None of the changes are material to this case and therefore references in this opinion are to the 2017 version of the rules.

The regulations reference the Wechsler Adult Intelligence Scale (WAIS) test, which is usually referred to as the Intelligence Quotient or "IQ" test.

In addition, the decisions below and arguments on appeal refer to the Diagnostic and Statistical Manual of Mental Disorders. Throughout this opinion it is referred to by its initials "DSM" and the edition number. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) [hereinafter DSM-5].

Parents filed the initial appeals on R.R.'s behalf. During the pendency of the proceedings, R.R. turned twenty-one and obtained an attorney. His attorney then directly represented him.

The DSM-5 also recognizes that IQ scores are not the sole basis for determining a person's level of intellectual disability. It provides that "a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests." Because we conclude that petitioner's IQ score of 75 qualified him for services, we do not reach his argument that the regulations allow individuals with higher scores to qualify if their functioning is comparable to persons with lower IQ scores.

The Secretary criticized the Board for issuing opposing findings of fact because the Board incorporated both the hearing officer's earlier finding that petitioner had never been diagnosed through an evaluation with an intellectual disability and supplemental finding that petitioner's school psychologist had diagnosed him with an intellectual disability. These findings are not contradictory. Although petitioner had not, through a formal evaluation, received a diagnosis, his school psychologist had made the diagnosis based on petitioner's clinical presentation. Moreover, although the hearing officer provided three sets of recommended findings, there was only one order from the Board, which arose following its acceptance of the hearing officer's third and final recommendation. "[T]he hearing officer acts as the fact finder for the Board; the hearing officer does not render an intermediate decision subject to review by the Board." Pratt v. Dep't of Soc. Welfare, 145 Vt. 138, 142, 482 A.2d 1389, 1391 (1984).

On appeal, the Agency of Human Services argues that the 2007 assessment was not entered into evidence. There is no basis to disregard the test result even though the assessment itself was not admitted. The facts that petitioner took the test and received a score of 75 were testified to without objection. Moreover, there was no challenge below to the validity of the score.

The Secretary's construction would contradict other provisions of the regulations that envision consideration of more than one test score. See Slocum v. Dep't of Soc. Welfare, 154 Vt. 474, 481, 580 A.2d 951, 956 (1990) (explaining that in interpreting regulation this Court considers "regulation as a whole, and strive[s] where possible to give effect to every word, clause, and sentence"). For example, DD Regs § 2.6(d) provides that if a person has scores both above and below 70, "it is the responsibility of the psychologist to determine which scores most accurately reflect the person's cognitive ability." Additionally, § 2.6(e) states: "The diagnosis in questionable cases should be based upon scores over time and multiple sources of measurement."