WELLS, Judge.
 

 Waggle Brothers, Inc. appeals from a final order of the Florida Unemployment Appeals Commission affirming an appeals referee’s determination that Waggle’s former employee, Michael Braun, was terminated from his job and thus qualified to receive unemployment compensation benefits. We reverse for two reasons, first, because Mr. Braun was not terminated from his job but voluntarily quit, and second, even if he had been terminated, it was for misconduct connected with his work.
 

 Mr. Braun was a dog handler employed by Waggle for approximately a year and a half. During the last six months that he was employed by Waggle, he was counseled by his employer at least four times that his disruptive behavior was adversely affecting his work and the workplace. On November 5, 2008, Mr. Braun signed a
 
 *875
 
 memorandum acknowledging: (1) that he had regularly exhibited aggressive behavior (screaming and yelling) toward other employees and the animals for which he was to care; (2) that his psychological problems were adversely affecting both this attitude and work performance; and, (3) that he had to rectify his behavioral problems.
 
 [1]
 

 Within days of signing this document, as Mr. Braun himself confirms, Mr. Braun engaged in a yet another shouting match with another employee during which Mr. Braun dropped to his knees before the other employee in a mock show of respect:
 

 MR. BRAUN: Okay. What happened was, I was scheduled—Maria [Burrell, Waggle’s co-owner and Braun’s supervisor] had always left us a list of things that we had to do and when we had to do them. And she had told—on that list, that I was responsible for the big dogs in the afternoon, after the break....
 

 I did what I was supposed to be doing, which is take them [the big dogs] out first. As soon as I opened the door, and the dogs run through the door, I see that Lucas, the guy that’s still working there, had already taken the big dogs out. And the gates were all open all the way to the outside. So I told him, why are you letting the dogs out? I have to take these dogs out. He said, [“] don’t understand^”] So I, I said to him, I have to take the dogs—I’m responsible for the big dogs. I have to take them out. He said, [“]no, no, look at the schedule^”] And he slams it against the wall. And he says, [“]it says I take the big dogs.[”] I said, no, it says you take the small dogs, and I pointed to exactly where it was, you take the big—small dogs out in the afternoon, and I’m responsible for the big dogs in the afternoon. [He says, “]No, no, no, you’re wrong.P’] That’s when I said, oh, that’s right, whatever.
 

 I told him those dogs can’t—the three dogs that just went past him can’t be with the big dogs. [He says, “]Oh, that’s okay. That’s okay.[”] That’s when I said, oh, you’re right. Everything you say is right. These dogs could get into a fight, but you’re right. And he’s telling me to go with the, the small dogs. That’s when I fell to my knee, and I said, you’re the, the boss. You’re the one that’s telling me all the rules and regulations.
 

 Following this interaction, which was observed by at least one of Waggle’s owners, Waggle placed Mr. Braun on a thirty day leave of absence so that he could get help for his admitted psychological problems:
 

 MR. BURRELL [co-owner of Waggle]: ... Did I not tell you the last conversation that we had that I was going to give you a thirty-day leave of absence ... [to] give you that opportunity to follow through with psychiatric or psychological help, okay, because the situation had become intolerable ... ?
 

 MR. BRAUN: Yes, you did tell me that.'
 

 Mr. Braun did not secure help to address his problems. Rather, one week into his month-long leave, Mr. Braun called Waggle to determine whether he was then placed on the work schedule. When he was told by a fellow employee that he was not, rather than speaking with Waggle’s owners who both set his work schedule and had repeatedly tried to help him— even giving him time off to address his
 
 *876
 
 inappropriate behavior — Mr. Braun immediately filed for unemployment compensation benefits.
 

 In December 2008, the Agency for Workforce Innovation, determined that Mr. Braun had been discharged and that this discharge was not for misconduct connected to his work. He was deemed qualified to receive benefits. Waggle appealed.
 

 Following a hearing, the appeals referee concluded that Mr. Braun was not disqualified from receiving benefits because (1) “it was shown that [Mr. Braun] was discharged” from his employment, and (2) “the record is devoid of competent evidence” to show that he was discharged for “misconduct connected with work.” Neither conclusion finds support in this record.
 

 While this Court will not reweigh evidence to come to a conclusion different from that of a trier of fact, we are not obligated to affirm an unsupported legal determination.
 
 See Porter v. Fla. Unemployment Appeals Comm’n,
 
 1 So.3d 1101, 1103 (Fla. 1st DCA 2009) (recognizing that, while the “question whether claimant left work voluntarily is one of fact and thus ‘within the province of the appeals referee,’ ” an appellate court “must reverse the Commission’s decision to affirm the referee’s findings where ... competent substantial evidence does not support the findings” (quoting
 
 Roman v. A-1 Specialty Gasolines, Inc.,
 
 682 So.2d 1241, 1242 (Fla. 1st DCA 1996))). As to whether Mr. Braun’s employment was terminated by his employer, the unrebutted evidence was that on November 6, 2008, after months of counseling by his employer, Mr. Braun acknowledged in writing that his psychological problems were having a significant impact on his work performance; that his aggressive behavior was significantly disrupting the workplace; and that he had to rectify these problems. Shortly thereafter, Mr. Braun admittedly engaged in yet another altercation with a co-worker during which he fell to his knees before the other employee in a display of mock supplication.
 

 Mr. Braun acknowledges that even after this altercation he was not let go, but was given thirty days off work to get help. In fact, Mr. Braun testified that after being off for only one week, he called Waggle to determine whether he was back on the work schedule. When a co-worker told him that he was not, he immediately applied for unemployment compensation without contacting either Waggle’s owners who had worked for months to keep him employed and get help for him (even lending him a substantial sum of money) or the supervisor (one of Waggle’s two owners) who made the work schedules.
 

 This uncontested testimony provides no support for the appeals referee’s conclusion that Mr. Braun had been terminated from his job following the mock supplication event. He clearly was not. Because Mr. Braun was not terminated from his job, but voluntarily quit, he was not entitled to benefits.
 
 See
 
 § 443.101(l)(a), Fla. Stat. (2008) (stating that “[a]n individual shall be disqualified for benefits ... [f]or the week in which he or she has voluntarily left his or her work without good cause attributable to his or her employing unit”).
 

 Moreover, even if Mr. Braun had been terminated from his job as the appeals referee found, he still would be entitled to no benefits because such a termination would have been for misconduct connected with his work.
 
 See
 
 § 443.101(l)(a), Fla. Stat. (2008) (stating that “[a]n individual shall be disqualified for benefits ... [f]or the week in which he or she ... has been discharged by his or her employing unit for misconduct connected with his or her work”);
 
 *877
 
 § 443.036(29)(a), Fla. Stat. (2008) (defining “misconduct” as “[c]onduct demonstrating willful or wanton disregard of an employer’s interests and found to be a deliberate violation or disregard of the standards of behavior which the employer has a right to expect of his or her employee”). The undisputed record is that after months of repeated disruptive behavior that had resulted in repeated counseling by his employer, Mr. Braun signed a memorandum admitting that his recurrent inappropriate behavior was adversely affecting both his job performance and the workplace in general.
 
 [2]
 
 He promised to take action to rectify these problems. Despite this acknowledgment and agreement, Mr. Braun did nothing to resolve these problems, but almost immediately engaged in additional wholly inappropriate and disruptive behavior. While it is true that an isolated instance of misconduct is insufficient to disqualify an employee from receipt of unemployment benefits, the undisputed facts in this case confirm that Mr. Braun’s conduct was anything but isolated and was tolerated far longer than necessary to support his termination for misconduct.
 
 [3]
 

 See Jackson v. Unemployment Appeals Comm’n,
 
 730 So.2d 719, 721 (Fla. 5th DCA 1999) (recognizing that “misconduct usually consists of repeated instances in the face of warnings”);
 
 Hines v. Dep’t of Labor & Employment Sec.,
 
 455 So.2d 1104, 1107 (Fla. 3d DCA 1984) (“While perhaps Hines’ conduct would not have constituted misconduct under the statute if it was a first occurrence, the fact that he had been previously warned against conducting himself in such a manner and he disregarded that warning amounts to misconduct under the facts of the present case.”)
 

 In short, the undisputed record is that Mr. Braun was not terminated by his employer, but voluntarily left his job. It is equally undisputed that even if he had been terminated, he would be disqualified from receiving benefits because of his repeated misconduct.
 

 Accordingly, the order on appeal entitling Mr. Braun to unemployment benefits is reversed.
 

 [1]
 

 . The memorandum also acknowledged a $2400 loan that Waggle had made to Mr. Braun, $600 of which had been forgiven, to assist him financially and so that he could address his behavioral problems.
 

 [2]
 

 . At the hearing, Mr. Braun did not deny that he had acknowledged in writing his repeated inappropriate behavior and poor work performance; he only tried to qualify it:
 

 MR. BURRELL: Okay. And you’re going to sit here and tell me that all of our conversations that we had in the last year, okay, that your psychological — are you going to say that you never admitted to me that your psychological difficulties were impacting your work? Did you ever — did we ever agree between us that this was in fact a problem with you and it was in fact showing up at work and dramatically affecting your employ — your, your work and your ability to get along with your fellow employees?
 

 MR. BRAUN: Not dramatically.
 

 MR. BURRELL: But you did agree that it was affecting your work?
 

 Mr. BRAUN: Slightly, yeah.
 

 [3]
 

 . If anything, this case proves the adage that no good deed goes unpunished.