# Third District Court of Appeal

## State of Florida

Opinion filed November 24, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D20-0690
Lower Tribunal No. 19F-05901
_____

**O.H.,**
Appellant,

vs.

**Agency for Persons with Disabilities,**
Appellee.

An Appeal from the State of Florida Department of Children and Families, Office of Appeal Hearings.

University of Miami School of Law, Children & Youth Law Clinic, and Bernard P. Perlmutter, and Kristen Calzadilla, Certified Legal Intern, for appellant.

Carrie B. McNamara, (Tallahassee), for appellee.

Before SCALES, LINDSEY, and MILLER, JJ.

LINDSEY, J.

Appellant O.H., a minor, appeals a Final Order from the Florida Department of Children and Families' Office of Appeal Hearings, affirming a decision by the Agency for Persons with Disabilities (the "Agency"), which denied O.H. Home and Community Based Services ("Services"). O.H.'s appeal largely rests on his contention that the applicable Florida Statute and Administrative Code Rules, as applied, violated his substantive due process rights under Hall v. Florida, 572 U.S. 701 (2014). Because Hall does not apply here and because the Final Order is based on competent substantial evidence, we affirm.

## I. BACKGROUND

In May 2014, O.H. and his sister were removed from their mother's care and placed in the custody of the Department of Children and Families ("DCF") because of suspected neglect and abuse. O.H. was placed in a foster home. The mother subsequently had her parental rights terminated. The judge found that O.H. and his sister would be endangered if they were returned to their mother, in part because she had an IQ score of 45, and her children also had "serious intellectual deficits and significant special needs."

In February of 2015, DCF referred O.H. to the Agency to determine whether he was eligible for Services. In March of 2015, O.H. applied for and briefly qualified for Services as a child between three and five years old who

2

was at high risk of a developmental disability.  In March of 2019, O.H. re-applied for Services, this time under the category of intellectual disability.  However, the Agency denied him Services because he did not meet the definition of intellectual disability under section 393.063(24), Florida Statutes (2021), and Florida Administrative Code Rules 65G-4.014 and 017.  O.H. sought review of the Agency's decision. After an administrative hearing, DCF's Office of Appeals Hearings issued a Final Order denying O.H.'s administrative appeal.  This appeal followed.

## II.    JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.030(b)(1)(C).  "We review an agency's conclusions of law de novo and we review the record to determine whether competent substantial evidence supports the agency's decision.  In doing so, 'we give no deference to agency interpretations of statutes or rules.'"   G.R. v. Agency for Perss. with Disabilities, 315 So. 3d 107, 108 (Fla. 3d DCA  2020) (citing A.C. v. Agency for Health Care Admin., 322 So. 3d 1182, 1187 (Fla. 3d DCA 2019)).  Unpreserved arguments are reviewed only for fundamental error.  Pumphrey v. Dep't of Child. & Fams., 292 So. 3d 1264, 1266 (Fla. 1st DCA 2020).

## III.   ANALYSIS

3

"Chapter 393 of the Florida Statutes establishes the framework for providing benefits to individuals with developmental disabilities." G.R., 315 So. 3d at 108. One such disability, "intellectual disability," is defined as:

> (24) "Intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior which manifests before the age of 18 and can reasonably be expected to continue indefinitely. For the purposes of this definition, the term:
>
> (a) "Adaptive behavior" means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
>
> (b) "Significantly subaverage general intellectual functioning" means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the agency.

§ 393.063(24), Fla. Stat. (2021).

The Florida Administrative Code delineates additional eligibility requirements for developmental disabilities. See Fla. Admin. Code R. 65G-4.014, 65G-4.017. To establish eligibility for an intellectual disability:

> (a) A single test or subtest should not be used alone to determine eligibility. If a person has significantly different (statistically defined) scores on different scales of a test or tests, or a great deal of variability on subtest scores of an IQ test, the full-scale score may not indicate mental retardation and should not be relied on as a valid score. In that instance, closer scrutiny is required to make an appropriate differential diagnosis. This may include review of school records, school placement, achievement scores, medical records, medication history, behavior during testing and the psychosocial situation at the time

4

of testing. Closer scrutiny must also be required when there is a great deal of variability between IQ scores on different IQ tests or different administrations of the same IQ test. Nothing here is intended to preclude clinical judgment from appropriately determining that a single full-scale IQ score of 70 or below, or two or more standard deviations below the mean, on an individually administered intelligence test is sufficient to establish eligibility.

(b) The performance measures for this category of adaptive functioning deficits must be validated by the professional judgment of a psychologist who is experienced in working with people who have retardation, who has specific training and validation in the assessment instrument that is used, and who is one of the following:

1. A Florida-licensed psychologist,
2. A Florida-licensed school psychologist,
3. A certified school psychologist.

(c) Any standardized test may be submitted as proof. However, the applicant must demonstrate that any test not presumptively accepted by the agency is valid. The following are presumptively accepted standardized tests of intelligence to establish eligibility for mental retardation:

1. Stanford-Binet Intelligence Test (all ages)
. . . .
4. Wechsler Intelligence Scale for Children (WISC) (children up to 15 years, 11 months),
. . . .
8. Comprehensive Test of Nonverbal Intelligence-2 (C-TONI 2),
. . . .
(d) The following tests of adaptive functioning are presumptively accepted in the determination:

1. Vineland Adaptive Behavior Scales,
. . . .
(e) In all cases, assessments or evaluations for eligibility

5

should be obtained from appropriately licensed professionals with experience and training in the instruments and population for whom eligibility is to be determined.

Fla. Admin. Code R. 65G-4.017.[1]

The Final Order affirmed the Agency's denial of Services, concluding that O.H. "demonstrated he meets the criteria for adaptive functioning but not the criteria for intellectual functioning." In doing so, the hearing officer considered evidence of O.H.'s school and medical records, testimony from his foster mother, as well as four full-scale IQ scores: three scores O.H. presented ranging from 64-70 and one score of 72 presented by the Agency.

His score of 64 on a Stanford-Binet, Fifth Edition was performed in January of 2015 by Dr. Antony Tanona, a clinical psychologist. His score of 72 on a nonverbal CTONI-2 was performed in February 2018 by Dr. Vanessa Archer, a clinical psychologist. His score of 69 on a WISC-V was performed in October of 2018 by Ms. Rachel Kosar, a Miami-Dade County public school psychology intern, under the supervision of a school social worker. Lastly, O.H. obtained a score of 70 on a WISC-V performed in November of 2019 by Dr. Karina McCoy, a clinical psychologist.

---

[1] Though we are applying a previous version of this rule, it was amended in 2020 to include a provision mandating that it would be reviewed and "if necessary, renewed through the rulemaking process five years from the effective date." Fla. Admin. Code R. 65G-4.017(9).

The hearing officer assigned "greater weight" to O.H.'s score of 72 on the evaluation performed by Dr. Archer and less weight to his other scores for two reasons. First, Dr. Tanona noted that O.H.'s score of 64 was partly attributable to his behavioral issues. Second, O.H.'s other scores of 69 and 70 from 2018 and 2019 respectively had "significant disparities in some of the sub-scores, which indicate[d] the full-scale IQ score[s] may not be reliable."

On appeal, O.H. challenges the Final Order on three grounds. First, he argues that section 393.063(24) and rules 65G-4.014 and 65.017 are unconstitutional as applied. Second, he argues that the hearing officer misapplied section 393.063(24) and rules 65G-4.014 and 65.017. Lastly, O.H. argues that the Final Order is not supported by competent substantial evidence.

## A. As-Applied Constitutional Challenge under <u>Hall</u>

For the first time on appeal, O.H. argues that section 393.063(24) and rules 65G-4.014 and 65G-4.017 are unconstitutional as applied to him pursuant to <u>Hall</u>. In <u>Hall</u>, a death penalty case interpreting and applying the Eighth Amendment to the United States Constitution, the United States Supreme Court invalidated the Florida Supreme Court's interpretation of a statute that "a person whose test score is above 70, including a score within

the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited." 572 U.S. at 711-12.[2] The Court held that prevailing medical standards require states to consider an IQ test's standard error of measurement to determine whether an individual is eligible for the death penalty.[3] Id. at 723. Additionally, the Court held that where an IQ score falls between 71 and 75, the inherent margin of error, "the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id.

O.H. argues that the Final Order violated his substantive due process rights under Hall for two reasons. First, O.H. contends that Dr. Archer's evaluation report did not include a standard error of measurement. Second, O.H. contends that the hearing officer failed "to consider deficits in adaptive

---

[2] In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the United States Supreme Court held that the execution of intellectually disabled people violated the Eighth Amendment's Cruel and Unusual Punishment Clause. Atkins left it to the states to create standards to determine whether individuals were intellectually disabled and therefore ineligible for execution. Id. at 317. Hall curtailed this power by imposing certain procedures to determine whether an individual is intellectually disabled for death penalty purposes.

[3] In doing so, the Supreme Court adopted the standard in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), published by the American Psychiatric Association. Hall, 572 U.S. at 723.

functioning to determine [whether] O.H. has an intellectual disability," even though his score of 72 falls within the inherent margin of error. We reject both arguments.

We recognize that Dr. Archer's report did not expressly include a standard error of measurement, and that reliance on that evaluation did not follow the method prescribed in Hall. This is of no moment. Hall is an Eighth Amendment case. Without pause we can conclude that eligibility for social programs and eligibility for the death penalty do not involve comparable constitutional concerns. Therefore, judicial restraint prevents us from extending Hall's reach to those determinations. See In re Holder, 945 So. 2d 1130, 1133 (Fla. 2016) ("[W]e have long subscribed to a principle of judicial restraint by which we avoid considering a constitutional question when the case can be decided on nonconstitutional grounds."); see also Dickerson v. Colvin, No. 5:14-cv-9-DCB-MTP, 2015 WL 5334287, *5 (S.D. Miss. 2015) (declining to extend Hall in the context of social security disability benefits).

We are similarly constrained by separation of powers principles. Because the Legislature is responsible for determining eligibility for social service benefit programs, it is for the Legislature to adopt or extend Hall's reasoning here. Not this Court. It logically follows then that the hearing

9

officer did not fundamentally err either by relying on an IQ score that did not expressly account for a standard error in measurement or by failing to consider whether O.H.'s adaptive functioning nevertheless rendered him intellectually disabled.

**B. Closer Scrutiny**

The Florida Administrative Code explains that in determining whether an individual meets the definition of intellectual disability:

> If a person has significantly different (statistically defined) scores on different scales of a test or tests, or a great deal of variability on subtest scores of an IQ test, the full-scale score may not indicate [intellectual disability] and should not be relied on as a valid score. *In that instance, closer scrutiny is required to make an appropriate differential diagnosis.* This may include review of school records, school placement, achievement scores, medical records, medication history, behavior during testing, and the psychosocial situation at the time of testing. . . . *Nothing here is intended to preclude clinical judgment from appropriately determining that a single full-scale IQ score of 70 or below, or two or more standard deviations below the mean, on an individually administered intelligence test is sufficient to establish eligibility.*

Fla. Admin. Code. R. 65G-4.017(3)(a) (emphasis added).

O.H. argues that the hearing officer incorrectly applied this Rule because he failed to apply closer scrutiny. In doing so, O.H. incorrectly implies that "closer scrutiny" requires a hearing officer to analyze additional evidence in his conclusions of law. In J.J. v. Agency for Persons with Disabilities, 174 So. 3d 372, 373 (Fla. 3d DCA 2014), this Court held that a

10

hearing officer applied closer scrutiny where the Agency's "expert addressed [additional] facts." Id. A review of the hearing transcripts requires the same result here. Expert and non-expert witnesses for both O.H. and the Agency addressed O.H.'s school records, school placement, and medication history.[4]

Specifically, O.H.'s foster mother, who planned to adopt O.H., testified that O.H. failed kindergarten "[b]ecause [his] teacher said his behavior [was] interfering with his school work" and that "[O.H.'s] grades [are] not good. It is like F, F, F." She also testified that O.H. had been prescribed Guanfacine and Vyvanse and that "[h]e is doing a little bit better, but I don't know if it is the medication or what, but he is doing a little bit better with me" but that he nevertheless cannot "complete homework on his own" and that he gets "angry" and "upset" when he can't understand things.

Ms. Kosar, who evaluated O.H. in 2018, testified that pursuant to O.H.'s individualized educational plan ("IEP"), which provides for "accommodations based on the needs of a student," O.H. "is eligible for the intellectual disability program and emotional behavioral disability program."

---

[4] We note that because the examples in this Rule are non-exhaustive, this is not the only way a hearing officer can satisfy the "closer scrutiny" requirement.

He originally only qualified for the emotional behavioral program, but he later qualified for the intellectual disability program as well based on the WISC-V diagnostic test Ms. Kosar administered. Nothing in the record suggests that the hearing officer did not consider this evidence. And the hearing officer did in fact include some of it in the Final Order.[5] Therefore, the record demonstrates that the hearing officer applied closer scrutiny here.

### C. Competent Substantial Evidence

In an administrative proceeding, this Court will only set aside a final order if it relies on findings of fact that are not supported by competent substantial evidence. § 120.68(7)(b), Fla Stat. (2021). This is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." De Groot v. Sheffield, 95 So. 2d 912, 916 (Fla. 1957). It does

---

[5] In his findings of fact, the hearing officer included the following statement:

> The petitioner is eight (8) years of age. He currently resides in a therapeutic foster home. He has been living with his current foster mother for approximately two years. He can speak but cannot pronounce some words and he cannot follow a conversation. He has difficulty reading but can write well. He has exhibited behavioral problems at school such as spitting on teachers. He takes medication to control his behavior. He failed kindergarten and receives failing grades in school.

Additionally, when discussing the Agency's position, the hearing officer noted that the Agency argued that "the petitioner's school IEP report describe him as eligible for emotional/behavioral disability programs."

12

not matter that there may be competent substantial evidence to support alternative findings of fact, only whether the hearing officer's findings of fact are supported by competent and substantial evidence. See Swanigan v. Dobbs House, 442 So. 2d 1026, 1027 (Fla. 1st DCA 1983); School District of Collier County. v. Fuqua, 136 So. 3d 687, 691 (Fla. 2d DCA 2014). Competent substantial evidence is a low threshold. It is for this reason that courts have upheld final orders on arguably less evidence than was presented here. See, e.g., G.R., 315 So. 3d 107 (affirming a final order where a "review of the record and order reveal[ed] the hearing officer properly considered all the competent evidence it was presented with"); A.W. v. Agency for Perss. with Disabilities, 288 So. 3d 91, 94-95 (Fla. 1st DCA 2019) (affirming a final order where "[t]he hearing officer relied on the testimony of the Agency's expert witness, who was qualified to provide a diagnosis pursuant to rule 65G-4.017, in determining that A.W. did not qualify"); J.J., 174 So. 3d at 372 (affirming a final order where the findings were supported by evidence "in the form of expert testimony and evaluations, IQ test results, and observations of J.J.'s adaptive behaviors").

O.H. also argues that the hearing officer incorrectly precluded the clinical judgment of three psychologists that evaluated O.H. This is incorrect. The final order expressly states that the hearing officer considered the

testimony and evidence submitted by *all* psychologists that either testified at the hearing or otherwise submitted evidence of a diagnosis of intellectual disability. In considering the clinical judgments presented below, the hearing officer simply made necessary credibility determinations. It is a longstanding principle that appellate courts do not either re-weigh the evidence or the credibility of witnesses. See Shaw v. Shaw, 334 So. 2d 13, 16 (Fla. 1976).

A careful review of the record, hearing testimony, and Final Order show that the hearing officer's findings are supported by competent substantial evidence. O.H.'s arguments to the contrary attempt to persuade us to reweigh the hearing officer's credibility determinations. The evidence shows that there were reliability concerns with O.H.'s full-scale IQ scores because they were either affected by his behavioral issues or had sub-score variability. Though Dr. Archer's test did not include a standard error of measurement, none was required. In any case, Dr. Archer did discuss the standard error of measurement in her subsequent integration report. And at the hearing, she testified that she applied reliable principles and methods in her examinations, explaining: "I wouldn't be practicing ethically if I didn't do so." Therefore, the hearing officer's decision to assign greater weight to Dr. Archer's evaluation and testimony is supported by competent substantial evidence. We leave it undisturbed.

14

## IV. THE DISSENT

Instead of explicitly accepting O.H.'s request to adopt <u>Hall</u>, the dissent reframes the issue on appeal in a manner that rests entirely on the premise that <u>Hall</u> has already been adopted and is therefore applicable to this appeal. It has not and is not. Further, the dissent repeatedly uses the term "preferred" test to conclude that there is no competent substantial evidence to support the Final Order. That term, however, appears nowhere in either statute, rule, code, or case law. There is competent substantial evidence to support the Final Order. However, the dissent would have us reweigh that evidence to reach a different result, an exercise of authority outside the bounds granted to us by law. We decline to do so.

## V. CONCLUSION

For the reasons set forth above, we decline to take up O.H.'s constitutional challenge. Moreover, because the hearing officer properly applied Florida law and because the Final Order is supported by competent substantial evidence, we affirm.

Affirmed.

SCALES, J., concurs.

15

MILLER, J., dissenting.

I respectfully dissent from the views expressed in the opinion of the majority. This case presents an issue of wide-reaching consequence. Namely, whether the Agency for Persons with Disabilities (the "Agency") is authorized to deny an applicant enrollment in the Individual Budgeting Home and Community-Based Services Medicaid Waiver Program (the "HCBS Waiver Program") based on a single full-scale IQ score that fails to account for the test's validity and reliability. Recognizing "as does the medical community, that the IQ test is imprecise" and "[i]ntellectual disability is a condition, not a number," the rules promulgated by the Agency require an examiner to interpret the results of certain IQ tests in accord with the instructions supplied by the producer and report published data relating to the test's reliability and validity. Hall v. Florida, 572 U.S. 701, 723 (2014); Fla. Admin. Code R. 65G-4.012. Further, although a single test score may be used to establish eligibility for benefits, it should not be used to deem an applicant ineligible. Fla. Admin. Code R. 65G-4.017(3)(a). Despite these rules, in the instant case, the hearing officer reached the conclusion O.H. was not intellectually disabled solely because of a single IQ test which failed

16

to comply with the regulatory scheme. This decision cannot withstand scrutiny.

## BACKGROUND

O.H. appeals from a final order by the Agency affirming the denial of his application for enrollment in the HCBS Waiver Program following an adversarial administrative hearing. At the time of his hearing, O.H. was eight years old. The relevant facts are not in dispute.

After he was determined to have been neglected or abused, O.H. was removed from his mother and placed with the custody of Department of Children and Families. Interactions between case workers and the mother yielded concerns regarding her cognitive abilities, and an IQ test was administered. The mother attained a full-scale score of 45, and severe adaptive deficits were observed. Consequently, the State sought to terminate her parental rights.

In support of termination, the State argued, and the dependency court found, the mother's severe intellectual limitations constituted a danger to both O.H. and his sister. Because the siblings were deemed to have "serious intellectual deficits and significant special needs," O.H. was placed in therapeutic foster care, where he remained under the supervision of Citrus Family Care Network and Family Resource Center.

In this setting, O.H. failed kindergarten and continued to consistently achieve failing grades. His speech was underdeveloped and, at times, incomprehensible. He was unable to read or complete homework on his own, engage in self-direction, observe health or safety protocols, or effectively follow a conversation. He currently exhibits certain impulse control and behavioral issues and participates in the Miami-Dade Public Schools' Exceptional Student Education Program under the classifications of "Emotional/Behavioral Disability" and "Intellectual Disability."

During his short life, O.H. has been subjected to a battery of different standardized tests, all of which have revealed significant limitations in intellectual and adaptive functioning. Efforts by his foster mother to enroll him in the HCBS Waiver Program proved futile. As is provided by the Florida Administrative Code (the "Code"), she sought and was granted an administrative hearing.

During the hearing, O.H. offered evidence regarding his adaptive deficits, including school records, school placement, achievement scores, medical records, medication history, and extensive testimony regarding his daily limitations. He also presented the results of three separate sets of IQ tests reflecting full-scale scores of 70 or below, indicating a significant

18

limitation in intellectual functioning. The Agency countered with the results of a different IQ test, upon which O.H. attained a full-scale IQ score of 72.

As relevant to IQ testing, the first examiner, Dr. Anthony Tanona, a clinical psychologist, administered the Stanford-Binet Intelligence Scales, Fifth Edition, which is one of two preferred standardized tests of intelligence to establish the level of intellectual functioning assessments under the Code.[6] He reported a full-scale IQ score of 64. Application of the standard error of measurement and 95% confidence interval calculation resulted in a range of scores between 61 and 69. Dr. Tanona opined O.H. was intellectually disabled.

The second set of examiners, Rachel Kosar, a Miami-Dade County Public Schools psychology intern, and Elizabeth Ruiz, a school social worker, administered the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), which is the other preferred standardized intelligence test under the Code. They reported a full-scale IQ score of 69. Like Dr. Tanona, Kosar opined O.H. was intellectually disabled.

---

[6] Rule 4.012 of the Florida Administrative Code list the two regulatorily preferred tests, providing, in pertinent part, "[f]or the purposes of chapters 393 and 916, [Florida Statutes], the Stanford-Binet Intelligence Scale or the Wechsler Adult & Infant Intelligence Scale . . . shall be used to determine intellectual disability and the level of intellectual functioning." Fla. Admin. Code R. 65G-4.012(1).

The third examiner, Dr. Karina McCoy, a clinical psychologist, also administered the WISC-V. She reported a full-scale IQ score of 70. Application of the standard error of measurement with a confidence interval of 95% resulted in a range of scores between 66 and 77. Dr. McCoy, too, opined O.H. suffered from an intellectual disability.

The fourth examiner, Dr. Vanessa Archer, a clinical psychologist retained by the Agency, administered a different IQ test, the Comprehensive Test of Non-Verbal Intelligence, Second Edition ("C-TONI II"), which, although presumptively valid when used in support of an application for benefits, is not one of the two preferred tests for measuring intellectual functioning under the Code.[7] She reported a full-scale IQ score of 72. She did not, however, apply the standard error of measurement, calculate a confidence interval, or publish validity or reliability data pertaining to the test, as is required in circumstances where an alternative test is administered.[8] She opined O.H. was not intellectually disabled.

---

[7] Dr. Archer vacillated in her testimony as to whether she administered the second or third edition of the C-TONI.

[8] Contrary to the argument advanced by the Agency, while Dr. Archer fleetingly mentioned "measurement of error ranges" in her report, she did not apply a standard error of measurement or publish reliability or validity data relating to test.

At the conclusion of the hearing, the hearing officer issued a lengthy written order. In the order, he made a threshold determination that O.H. exhibited deficits in adaptive behavior, manifesting before the age of eighteen and reasonably expected to continue indefinitely. Confining his remaining analysis to the relative validity of the IQ tests, the hearing officer assigned "greater weight to the evaluation conducted by Dr. Archer," rejected the reliability of the other three scores, concluding O.H. had underperformed, and determined O.H. was not intellectually disabled, but rather suffered solely from concurrently diagnosed behavioral issues. The instant appeal ensued.

## STANDARD OF REVIEW

Section 120.68(1)(a), Florida Statutes (2021), entitles "a party adversely affected by final agency action" to judicial review. The legislature has placed tight limits on that review, but a reviewing court must remand a case for further proceedings if agency action is not supported by competent, substantial evidence or rests upon an erroneous interpretation of law. § 120.68(7)(b), (d), Fla. Stat.; see also M.H. v. Dep't of Child. & Fam. Servs., 977 So. 2d 755, 759 (Fla. 2d DCA 2008). In conducting this review, no deference is extended to an agency's interpretation of law. See Art. V § 21, Fla. Const. ("In interpreting a state statute or rule, a state court or an officer

21

hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

## LEGAL ANALYSIS

The Home and Community Based Services Waiver Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396n(c), allows certain persons with developmental disabilities to receive Medicaid services. Under the Act, states are authorized to develop home and community-based services waivers to meet the needs of those persons who prefer to receive long-term care services in their home or community, rather than in an institutional setting. See 42 U.S.C. § 1396n(c). Florida is a participant in the Home and Community Based Waiver Program. See Fla. Admin. Code R. 59G-13.080.

To establish eligibility for services, an applicant must have a statutorily defined developmental disability. § 393.063(12), Fla. Stat. (2021). Chapter 393, Florida Statutes, defines a "developmental disability" as "a disorder or syndrome that is attributable to intellectual disability . . . that manifests before the age of [eighteen]; and that constitutes a substantial handicap that can reasonably be expected to continue indefinitely." Id. The term "intellectual disability" as set forth in the definition, "means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive

22

behavior which manifests before the age of [eighteen] and can reasonably be expected to continue indefinitely." § 393.063(24), Fla. Stat. "Significantly subaverage general intellectual functioning" is defined, in turn, as "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the agency." § 393.063(24)(b), Fla. Stat.; see also Fla. Admin. Code. R. 65G-4.014(3).

As cogently explained by Dr. Tanona in the proceedings below, for most IQ tests, the mean is 100 and the standard deviation is 15. Thus, "two or more standard deviations below the mean" generally translates to a full-scale score of approximately 70 points or below.

The Agency's rules further expound upon the criteria relevant to eligibility determinations. Rule 65G-4.012 of the Code provides "the Stanford-Binet Intelligence Scale or the Wechsler Adult & Infant Intelligence Scale [WAIS], administered by or under the direct supervision of a psychologist or school psychologist licensed under chapter 490, [Florida Statutes,] *shall* be used to determine intellectual disability and the level of intellectual functioning." Fla. Admin. Code R. 65G-4.012(1) (emphasis added). The rule contains a closely circumscribed exception in those instances where a test administrator determines that "given the condition of the individual to be tested, the Stanford-Binet Intelligence Scale or the

23

Wechsler Adult & Infant Intelligence Scale are not valid and reliable." Fla. Admin. Code R. 65G-4.012(2). Only then may "an alternative test or evaluation procedure, administered and interpreted in conformance with the instructions provided by the producer of the tests or evaluation materials . . . be used." Id.

In such circumstances, testing or evaluation must be "administered and interpreted in conformance with the instructions provided by the producer of the tests or evaluation materials" and the results "*must* include reference to published validity and reliability data for the specified test or evaluation procedure." Id. (emphasis added).

Florida Administrative Code Rule 65G-4.017(3)(a) further provides:

> A single test or subtest *should not* be used alone to determine eligibility. If a person has significantly different (statistically defined) scores on different scales of a test or tests, or a great deal of variability on subtest scores of an IQ test, the full-scale score may not indicate mental retardation and should not be relied on as a valid score. In that instance, closer scrutiny is required to make an appropriate differential diagnosis. This may include review of school records, school placement, achievement scores, medical records, medication history, behavior during testing and the psychosocial situation at the time of testing. Closer scrutiny *must also* be required when there is a great deal of variability between IQ scores on different IQ tests or different administrations of the same IQ test.

Fla. Admin. Code R. 65G-4.017(3)(a) (emphasis added). The rule, however, contains the caveat that "[n]othing here is intended to preclude clinical

24

judgment from appropriately determining that a single full-scale IQ score of 70 or below, or two or more standard deviations below the mean, on an individually administered intelligence test is sufficient to establish eligibility." Id.

As expected, this statutory and regulatory framework is consistent with the clinical standards promulgated by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders (the "DSM-5").[9] In this vein, in a clinical setting, intellectual functioning "is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." Id.

Both the rules and DSM-5 recognize IQ tests are not infallible. To account for the clinically accepted margin of error, in Florida, tests must be "administered and interpreted in conformance with instructions provided by

---

[9] According to the DSM-5:

> Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally ± 5 points). On tests with standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013).

the producer of the tests." Fla. Admin. Code R. 65G-4.012(2). Moreover, the results of non-regulatorily preferred tests, meaning all tests other than the Stanford-Binet or Wechsler Intelligence Scale, "must include reference to published validity and reliability data." Id. In this regard, results are subject to a standard error of measurement ("SEM"), which varies depending upon the test. See generally John H. Blume et. al., Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases, 18 Cornell J.L. & Pub. Pol'y 689, 698–700 (2009). Application of the SEM yields a confidence interval, representing a likely range of values, rather than a single numerical value.

The clinical importance of the SEM has been discussed at length by our highest court. In Hall v. Florida, 572 U.S. 701 (2014), albeit in a vastly different context, the Supreme Court held that diagnosing intellectual functioning through a fixed number IQ, as opposed to considering a fluid range accounting for inherent testing imprecisions in conjunction with adaptive functioning, constitutes an unacceptable departure from established psychiatric principles. There, the court considered the constitutionality surrounding the application of a Florida statute proscribing the execution of intellectually disabled prisoners.

Mirroring the language contained in section 393.063, Florida Statutes, the relevant statute in Hall defined "intellectual disability" as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age [eighteen]." 572 U.S. at 711 (quoting § 921.137(1), Fla. Stat. (2013)). Like the instant provisions, the statute further defined "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." Id.

Citing widely understood scientific principles, particularly those encapsulated in the DSM-5, the court determined that "an IQ score [is not] final and conclusive evidence of a defendant's intellectual capacity, [and] experts in the field would consider other evidence." Id. at 712. In that regard, the court observed the "standard error of measurement" in IQ tests "reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score." Id. at 713. Thus, "[f]or purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies." Id. Thus, "an individual with an IQ test score 'between 70 and 75 or lower'

27

. . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Id. at 722 (quoting Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002)). Consequently, "[f]or professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." Id. at 714.

Relying upon a slip opinion from the United States District Court for the Southern District of Mississippi, the majority contends Hall is inapplicable. I agree the constitutional principles advanced in Hall have no place here, and certainly different policy considerations inform death penalty jurisprudence. However, Hall is useful in that it explains the significance of the SEM. And, one should not overlook the observation by the court that, "[t]he definition of intellectual disability by skilled professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans," thus, "[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." Id. at 710.

Heeding these words, numerous courts have cited Hall in considering eligibility for social service benefits. See In re R.R., 210 A.3d 1246, 1251

(Vt. 2019) (determining eligibility for developmental disability services); Craig v. Comm'r of Soc. Sec., No. 1:14-cv-966, 2015 WL 8207480, at *14 (S.D. Ohio Dec. 7, 2015) (determining eligibility for supplemental social security income benefits); Rhinehart v. Comm'r of Soc. Sec. Admin., No. 3:20CV00154-JTR, 2021 WL 1579903, at *3 (E.D. Ark. Apr. 22, 2021) (same); Bryant v. Berryhill, 1:17-cv-01850-JMS-TAB, 2018 WL 494640, at *5 (S.D. Ind. Jan. 22, 2018) (determining eligibility for social security disability benefits); Davis v. Colvin, No. 14-C-104, 2014 WL 4954470, at *1 n.11 (E.D. Wis. Oct. 2, 2014) (same).

Against this judicial landscape, the unanimous opinion of the experts in this case is that O.H. has "deficits in adaptive behavior which [have] manifest[ed] before the age of [eighteen] and can reasonably be expected to continue indefinitely." § 393.063(24), Fla. Stat. The dispute, therefore, solely concerns whether O.H. suffers from significantly subaverage general intellectual functioning.

As explained previously, the Code equates subaverage intellectual functioning with two or more standard deviations below the mean, roughly translating to a full-scale IQ score at or below 70. Here, it is axiomatic that O.H.'s scores on the three regulatorily preferred, presumptively valid tests were reported as 70 or below. The hearing officer, however, relied upon Dr.

29

Archer's reported score of 72 on a non-preferred test, without regard for the regulatory prerequisites. This precipitated a four-fold error.

First, Dr. Archer did not indicate that given the condition of O.H., "the Stanford-Binet Intelligence Scale or the Wechsler Adult & Infant Intelligence Scale [were] not valid and reliable." Fla. Admin. Code R. 65G-4.012(2). Instead, she initially testified the C-TONI II was preferable for non-native English speakers,[10] and, when pressed further, she indicated "there is more than one way[] to skin a cat . . . and measures like the Weschsler and the Stanford-Binet will give you a better idea of a person's individual strengths and weaknesses within their level of cognitive abilities." She then indicated she also preferred to administer the C-TONI II to individuals with a history of neglect. This testimony fell short of satisfying the rule-based prerequisite to administering the alternative test.

Second, because the C-TONI II is a non-preferred test, it must be interpreted in conformity with instructions provided by the producer of the test, and the administrator is also required to include validity or reliability data in the score report. Fla. Admin. Code R. 65G-4.012(2). Here, Dr. Archer did neither. This omission effectively removed from the hearing officer's consideration the test's acknowledged and inherent margin of error, thus,

---

[10] O.H. only speaks English.

vitiating the procedural safeguards implemented to ensure the reliability of alternative test results. This error was further compounded because the hearing officer received evidence regarding the reliability and validity data relating to the two regulatorily preferred tests, the Stanford-Binet and WISC-V. This painted an artificial picture the C-TONI II was precise, while the preferred tests were imprecise.

Third, although she initially drew parallels between the results reported on the C-TONI II and the preferred tests, when directly asked whether "the 72 [she] obtained [was] comparable to the 69 and the 70," Dr. Archer replied, "I am going to say no." She further elaborated by highlighting perceived disparities in subtest scores in the preferred tests she deemed demonstrated unreliability. The hearing officer later adopted this reasoning.

In the face of such testimony, the Code gives specific direction. It provides that where there is a "great deal of variability" between scores on different tests or subtest scores of a test, "closer scrutiny" must be applied. Fla. Admin. Code R. 65G-4.017(3)(a). To this end, a "review of school records, school placement, achievement scores, medical records, medication history, behavior during testing[,] and the psychosocial situation at the time of testing," is appropriate. Id. Here, the hearing officer bifurcated the evidence into two distinct categories. Evidence of challenges in day-to-

31

day living was deemed probative only of adaptive functioning, while the determination of intellectual functioning was derived solely from the winner of the battle of the competing IQ scores.  Thus, there was no closer scrutiny.

Fourth, and perhaps most importantly, while the Code authorizes an examiner to exercise clinical judgment in "appropriately determining that a single full-scale IQ score of 70 or below, or two or more standard deviations below the mean, on an individually administered intelligence test is sufficient to establish eligibility," it does not contain a similar provision allowing an examiner to disqualify an applicant from services because of a single test score.  Fla. Admin. Code R. 65G-4.017(3)(a).  Instead, it provides the opposite.  "A single test or subtest should not be used alone to determine eligibility."  Id.  Here, distilled to its essence, the finding O.H. was not intellectually disabled rested upon a single full-scale IQ score that failed to comply with the applicable regulations.

Long ago the Florida Supreme Court defined competent, substantial evidence as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion."  De Groot v. Sheffield, 95 So. 2d 912, 916 (Fla. 1957).  In his well-reasoned concurring opinion in Dunn v. State, 454 So. 2d 641, 649 n.11 (Fla. 5th DCA 1984), Judge Cowart further elaborated as follows:

32

> The term "competent substantial evidence" does not relate to the quality, character, convincing power, probative value or weight of the evidence but refers to the existence of some evidence (quantity) as to each essential element and as to the legality and admissibility of that evidence. Competency of evidence refers to its admissibility under legal rules of evidence. "Substantial" requires that there be some (more than a mere iota or scintilla), real, material, pertinent, and relevant evidence (as distinguished from ethereal, metaphysical, speculative or merely theoretical evidence or hypothetical possibilities) having definite probative value (that is, "tending to prove") as to each essential element of the offense charged.

While it is not the function of an appellate court to "reweigh evidence to come to a conclusion different from that of a trier of fact," there is no "obligat[ion] to affirm an unsupported legal determination." Waggle Bros., Inc. v. Fla. Unemployment Appeals Com'n, 37 So. 3d 873, 876 (Fla. 3d DCA 2010).

Here, Dr. Archer's test results ran afoul of the applicable regulatory scheme. They therefore cannot be deemed competent or substantial. Because the test results alone formed the basis of the conclusion O.H. did not suffer from subaverage intellectual functioning, the ultimate finding by the hearing officer is not premised upon competent, substantial evidence. Further, in examining only test scores to determine intellectual function, the hearing officer overlooked the statutory admonition to apply "closer scrutiny." Fla. Admin. Code R. 65G-4.017(3)(a). Accordingly, I conclude we are dutybound to remand the case and allow additional consideration on the issue of intellectual functioning.